# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 2990 | **DATE** | 10/30/2001 |
| **CASE TITLE** | USA, ex rel. William Cabrera vs. Thomas F. Page, Warden | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Petitioner's application for writ of habeas corpus is granted with respect to Petitioner's 1983 convictions for murder, robbery and burglary, conditioned on the invalidation of the other, presumptively lawful, sentences authorizing his continued confinement. Petitioner's 1983 convictions for murder, robbery and burglary are declared to be void and of no effect unless the State of Illinois retries Petitioner within 120 days of this order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | **2** | |
| ✓ | Notices mailed by judge's staff. | | number of notices | |
| | Notified counsel by telephone. | | OCT 31 2001 | |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. Mailed by MD. | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | 10/30/2001 | |
| MD | courtroom deputy's initials | | date mailed notice | |
| | | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

Document Number

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA ex rel.  )
WILLIAM CABRERA,                   )
                                   )
Petitioner,                        )   No. 97 C 2990
                                   )
v.                                 )   Judge Joan H. Lefkow
                                   )
THOMAS F. PAGE, Warden,            )
                                   )
Respondent.                        )

**DOCKETED**

**OCT 3 1 2001**

## MEMORANDUM OPINION AND ORDER

Petitioner William Cabrera challenges his convictions for murder, robbery and burglary entered in the Circuit Court of Cook County, Illinois. The court grants the writ.[1]

## LEGAL STANDARDS

Under 28 U.S.C. § 2254(d), a federal court may not grant a prisoner's habeas corpus petition unless the state court's adjudication of the claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." When considering the § 2254 petition, this court will presume that any state court

---

[1] Following the convictions at issue here, Cabrera was convicted of another murder resulting in a sentence of imprisonment for life. Vacating the convictions at issue here will accordingly not affect the duration of his imprisonment. This petition is not moot, however, because of the possibility, however remote, that the other conviction or resulting sentence may be set aside. *Benton v. Maryland*, 395 U.S. 784, 788-91 (1969). *Benton's* reasoning is questionable in light of *Spencer v. Kemna*, 523 U.S. 1 (1998), and the Court's more restrictive view of the "case or controversy" requirement. Nevertheless, while the Court in *Spencer* declined to extend "our presumption of collateral consequences (or our willingness to accept hypothetical consequences)," *id.* at 12, to parole revocations, *id.* at 14, it left the presumption intact with respect to criminal convictions. *See Diaz v. Duckworth*, 143 F.3d 345 (7th Cir. 1998).

factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Before reviewing the state court's decision, however, this court must determine whether the petitioner fairly presented his federal claims to the state courts, as any claim not presented to the state's highest court is deemed procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999); *Wilson v. Briley*, 243 F.3d 325, 326 (7th Cir. 2001); *Bocian v. Godinez*, 101 F.3d 465, 468 (7th Cir. 1996). A federal court may not grant habeas relief on a defaulted claim unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)); *Anderson v. Cowen*, 227 F.3d 893, 899 (7th Cir. 2000).

## PROCEDURAL HISTORY

On April 13, 1983, a jury convicted Petitioner of murder, burglary and robbery. On May 5, 1983, the trial judge imposed extended sentences for all three offenses, 60 years for murder and 14 years in prison for burglary and robbery, all sentences to run concurrently. The Illinois Appellate Court affirmed Petitioner's conviction on June 20, 1985, but found the trial court erred in imposing extended term sentences for the burglary and robbery convictions and shortened them to seven years each. *People v. Cabrera*, 134 Ill.App.3d 526, 480 N.E.2d 1170 (1st Dist. 1985) ("*Cabrera I*"). The Illinois Supreme Court affirmed on April 16, 1987. *People v. Cabrera*, 116 Ill.2d 474, 508 N.E.2d 708 (1987) ("*Cabrera II*"). The United States Supreme Court denied certiorari November 2, 1987. *Cabrera v. Illinois*, 484 U.S. 929 (1987).

Petitioner filed a *pro se* post-conviction petition which was dismissed as untimely on May 28, 1992. The Illinois Appellate Court affirmed the denial of the post-conviction petition on December 31, 1992, and the Illinois Supreme Court denied Petitioner leave to appeal on June 3,

1993. On August 14, 1992, Petitioner filed his first federal habeas corpus petition, which was dismissed without prejudice for failure to exhaust state court remedies on October 29, 1993, apparently on the mistaken belief that Petitioner's post-conviction proceedings were still pending. The present petition for habeas corpus was received April 24, 1997.[2/] The petition was originally assigned to Judge Alesia of this court. On January 22, 1998, it was reassigned to Judge Andersen and on September 5, 2000 to the undersigned.

## EVIDENCE AT TRIAL

Evidence at trial showed that on the night of February 10, 1981, the offices of the Assyrian National Foundation in Chicago were broken into, money was stolen, and Yoel A. Keena, a 74-year old man staying as a guest at the Foundation, was killed as a result of strangulation and battery with a blunt instrument.

At the crime scene detectives found a receipt for travelers' checks issued in Keena's name. Tracing Keena's checks, they learned that they had been used to purchase clothing at the "Different Circle" store in the Century Mall in Chicago. The police questioned the assistant sales manager, Derrick Moore, and learned that three men had come into the store together at about 8 p.m. on February 11 and a man later identified as Ruben Lopez purchased a red jacket, a white shirt with a Popeye logo, and a necktie using a traveler's check, and an identification card bearing Lopez' picture had been used. Moore watched the men go together to another store and emerge with more merchandise.

On February 23, after looking through police "mug shots," Moore identified a photograph of Petitioner as one of the men present with Lopez when he cashed the check, and the police

---

[2/] As the Seventh Circuit held in *Jones v. Bertrand*, 171 F.3d 499 (7th Cir. 1999), that pro se petitions filed by incarcerated persons receive the benefit of the "mailbox rule" of *Houston v. Lack*, 487 U.S. 266 (1988), this petition is deemed filed within the "grace period" announced by *Lindh v. Murphy*, 96 F.3d 856, 866 (7th Cir. 1996), rev'd on other grounds, 521 U.S. 320 (1997), and exempt from the one-year limitations period of 28 U.S.C. § 2244(d) enacted by the Anti-Terrorism and Effective Death Penalty Act (AEDPA).

arrested Petitioner in his home. After waiving his Miranda rights, Petitioner then gave a series of statements, first denying any knowledge of the cashing of the check or the murder, then later telling the detectives that Lopez had approached him with the checks, saying that he had found them in the alley. Petitioner changed his story again, and said that Lopez told him he had obtained the checks by "ripping off a place" next to a dog-grooming parlor, and Lopez and he then went to the shopping mall and cashed the checks.

Searching Lopez's apartment with the consent of his mother and sister, police found a white shirt with a Popeye logo which Petitioner identified as one of the items purchased with the stolen traveler's checks. Continuing the search, the police found an identification card that Derrick Moore later identified as the card used by Lopez in cashing the traveler's checks. Detectives later found the red jacket that had been purchased at the "Different Circle" store.

On February 26 Petitioner made yet another even more incriminating statement, telling the detectives that the night before the checks were cashed he and Lopez had entered the Foundation through a broken window in the office. Once inside, Lopez told him to "search in the front" of the Foundation. Petitioner found a metal cash box, pried it open, and took the $40 in it. Petitioner said that while he was in the front office, Lopez went to the back of the Foundation where he found the victim, who had been awakened by the intrusion. Petitioner saw Lopez strike the victim twice. Petitioner then went to the back room and searched the victim's pockets, finding the traveler's checks. He and Lopez then left the premises, Lopez taking the traveler's checks and the defendant keeping the $40. Petitioner stated that on the followingday, Lopez told him that he was going to cash the traveler's checks; if Petitioner came along, Lopez would buy something for him. Petitioner agreed, and several items of clothing were purchased with the checks, including a red jacket. Petitioner then signed a written statement to this effect, and signed a consent to search his apartment again, where the police found the two pairs of pants Lopez had bought for Petitioner.

## PETITIONER'S CLAIMS

Petitioner raises six claims: (1) Petitioner was denied the right to trial by a fair and impartial jury because post-conviction juror polling indicated possible dissent; (2) the state failed to prove beyond a reasonable doubt that Petitioner entered the building where the crime occurred with an intent to commit robbery; (3) probable cause did not exist for Petitioner's warrantless arrest; (4) the Illinois legislature failed to provide Petitioner with adequate and meaningful notice of changes in Illinois' post-conviction relief statute, thereby denying Petitioner due process of law, and also deprived Petitioner of access to the courts in violation of the First Amendment; (5) ineffective assistance of appellate counsel; and (6) Petitioner was denied due process of the law because the Illinois felony murder statute holds a person responsible for another's actions without proof of the elements of first degree murder. Respondent concedes that Petitioner has exhausted all state court remedies, but asserts that Petitioner has procedurally defaulted his fourth and sixth claims.

## 1. Trial By A Fair And Impartial Jury

While polling the jury after the guilty verdict, the following exchange occurred:

THE COURT: I'm going to ask you this question, and I want you to pay attention to it. Was this and is this now your verdict, Miss Cancinelli [sic]?

MS. CANCINELLI[3/] [sic] [juror]: Can I say what I have to say, or do I have to give a yes, or no answer?

THE COURT: I want a yes or no answer. Was this and is this now your verdict?

MS. CANCINELLI [sic]: I found in my own person mind--

THE COURT: I said I want a yes or no answer. Was this and is this now your verdict?

MS. CANCINELLI [sic]: Yes.

---

[3/] The correct spelling of this juror's surname is Ciancanelli.

*Cabrera I*, 480 N.E.2d at 1172. Petitioner argues that the trial court's refusal to provide this juror with an opportunity to express any possible disagreement with the verdict calls the jury's unanimity into question. Petitioner notes that after the polling was complete, the trial court denied his counsel's request that Ms. Ciancanelli's statements be put on the record, and that Ms. Ciancanelli gave a sworn statement, in the presence of a court reporter, stating that at the time of the polling she had wished to recant her guilty verdict. Both the Illinois Appellate and Supreme Courts found Petitioner's claim without merit.

The Illinois Appellate Court first noted that the Sixth Amendment of the United States Constitution guarantees a trial by an impartial jury, and that "[e]ssential to that guarantee is the requirement that the verdict reached be freely arrived at by each juror." *Cabrera I*, 480 N.E.2d at 1172-73. The court then distinguished this case from cases in which Illinois courts found that a trial judge did not properly explore a juror's hesitant, ambivalent, or dissenting response when polled. The court found that Ms. Ciancanelli's response did not indicate any hesitancy or ambivalence and further determined that it would not second-guess the trial court's observations regarding the juror's demeanor and tone of voice. Moreover, the court held that Ms. Ciancanelli's later statement was neither admissible nor reviewable by the court, as it went to the deliberation process and was taken after the verdict had been read and the jury had already been polled and discharged. The Illinois Supreme Court agreed.

The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992). *See also Sullivan v. Louisiana*, 508 U.S. 275, 277 ("The Sixth Amendment provides "); *Porter v. Gramley*, 112 F.3d 1308, 1315 (7th Cir. 1997).

Petitioner does not argue that the state court decisions were contrary to, or involved an unreasonable application, of clearly established federal law. Instead, Petitioner argues that

"[t]he refusal of the trial court to provide juror, Ms. Ciancanelli, with an opportunity to express any possible disagreement she had with the verdict's [sic] raises doubt as to the unanimity of the jury" and that "[t]he Appellate Court, in holding that the juror's replies did not indicate ambivalence or hesitancy in her answer, misconstrued the facts of the case at bar." (Pet. at 29.) Petitioner therefore appears to claim that the state court decisions were based on an unreasonable determination of the facts presented. The court disagrees. At most, the colloquy between the trial court and Ms. Ciancanelli indicated that she wanted to further explain why she decided on her verdict, not that her verdict was erroneous.

With respect to Ms. Ciancanelli's later statement, the state court ruling was completely consistent with federal law as determined by the Supreme Court. The Supreme Court has stated that by the beginning of the twentieth century, there existed a firmly established common-law rule that "flatly prohibited the admission of juror testimony to impeach a jury verdict" and that unless there was evidence of outside influence on the jury, juror testimony impeaching a verdict is inadmissible. *Tanner v. United States*, 483 U.S. 107, 117 (1987) (citing, among other cases, *McDonald v. Pless*, 238 U.S. 264, 267 (1915)). Cf. Fed. R. Evid. 606(b). Petitioner does not argue that Ms. Ciancanelli's proffered recantation falls into the extraneous influence exception. Petitioner is not entitled to habeas corpus relief based on his first claim.

## 2.   Failure To Prove Burglary Beyond A Reasonable Doubt

Petitioner was found guilty by a jury of murder, burglary, and robbery. The evidence at trial showed that Lopez, rather than Petitioner, actually killed Keena. Nevertheless, under Illinois law, "a person is legally accountable for the conduct of another when . . . either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning

7

or commission of the offense." Ill.Rev.Stat.1981, ch. 38, par. 5-2(c) (now codified at 720 ILCS 5/5-2(c)). A reasonable jury could have found Petitioner accountable for Lopez's acts. Petitioner did not challenge the sufficiency of the evidence with respect to his convictions for murder and robbery.

Petitioner did challenge the sufficiency of the evidence with respect to his burglary conviction. Illinois law provided that "[a] person commits burglary when without authority he knowingly enters . . . a building . . . with intent to commit therein a felony or theft." *Cabrera I*, 480 N.E.2d at 1175 (quoting Ill. Rev. Stat. 1981, ch. 38, par. 19-1(a)). The evidence showed that Petitioner had entered a building without authorization and his intent to commit a theft could reasonably be inferred from this, absent another explanation for his presence there.

Nevertheless, Petitioner was not charged with entering a building with intent to commit a theft; he was charged with entering a building with the intent to commit *robbery*. The information charged that Petitioner "committed the offense of burglary in that he, without authority, knowingly entered into a building, to wit: the dwelling of Yoel Keena with the intent to commit the offense of robbery therein." Tr. 2237.

Since the Foundation was not a residential building, and there was no evidence that Petitioner or Lopez knew Keena was living there, Petitioner could not have had the intention to commit robbery when he entered the building. Because the prosecution's case was built on Petitioner's statements to the police, there appears to be no reason why the state could not have initially charged Petitioner with the intent to commit theft, or amended the information prior to trial. Only in the jury instruction conference did the prosecution belatedly recognize that the charge did not fit the evidence against Petitioner. The prosecutor asked that the jury be instructed that it could convict Petitioner of burglary if they found he entered the building with the intent to commit *robbery or theft*. Petitioner's counsel objected, and the trial judge refused

8

the prosecution's instruction. Distinguishing cases in which the defendant had not been surprised

by a variation between the acts charged in the indictment and jury instructions based upon

evidence adduced at trial, the court stated that "you [the prosecution] are interjecting the offense

of theft. That has not even been mentioned. It was not mentioned in opening statements." Tr. at

1961. Commenting that "it is clear to this Court that whoever made up this charge, apparently,

didn't know what they were doing," the trial judge found it "extremely prejudicial" to include

intent to commit theft in the instruction. Tr. at 1362.[4/]

The jury was accordingly instructed: "a person commits the offense of burglary when he

enters a building when he, without authority, knowingly enters a building with intent to commit

therein the offense of robbery." Tr. at 2128. Petitioner was separately charged with robbery,

and the jury instructions correctly defined robbery as "[taking] property from the person or

presence of another by the use of force or by threatening the imminent use of force." Tr. at

2127. These instructions were recapitulated at Tr. 2130-31, in which the elements of burglary

and robbery were set forth. The burglary instruction again stated that an element of burglary was

the intent to commit robbery. Despite the lack of evidence of Petitioner's intent to commit

robbery at the time he entered the building, the jury convicted him of burglary anyway.

On appeal, Petitioner argued that his conviction for burglary should be reversed because

there was no evidence showing that either he or Lopez had reason to know that anyone was in the

---

[4/] In this the trial judge may have erred. Under Illinois law, jury instructions may depart from the charging document to correspond to the evidence "as long as the variance does not mislead the defendant in the presentation of his defense, does not expose him to double jeopardy, and as long as there was ample evidence presented to the jury to permit it to find the defendant guilty of the charged crime beyond a reasonable doubt." *Jenkins v. Nelson*, 157 F.3d 485, 498 (7th Cir. 1998), *cert. denied*, 537 U.S. 1039 (1999); *citing, inter alia, People v. Foster*, 103 Ill.App.3d 372, 431 N.E.2d 430 (1982), and *People v. McEvoy*, 33 Ill.App.3d 409, 337 N.E.2d 437 (1975). Here Petitioner did not take the stand, and his intent at the time he entered the Foundation was primarily to be inferred from his statements to police. His counsel attempted to argue that his statements were coerced and unreliable. It is doubtful that charging him with the intent to commit theft, rather than robbery, would have affected his defense.

building when they entered it, hence no evidence of intent to commit robbery, the felony upon which the burglary charge was predicated. In response, the state feebly sought to find supporting evidence in the record, arguing that the violence of the assault supported an inference of an original intent to rob, and noting that Petitioner had lived a short distance away from the Assyrian National Foundation. Ans. Exh. (e) at 41-44. Alternatively, the state argued that Petitioner had not been prejudiced, mischaracterizing Petitioner's argument as an attack on the charging information.

The Illinois Appellate Court either misunderstood or ignored Petitioner's argument. The court stated that Petitioner's intent to commit *a theft* could be inferred from the evidence, ignoring the fact that this was not what the jury was instructed to find. *Cabrera I*, 480 N.E.2d at 1175. The Illinois Supreme Court, in contrast, recognized that Petitioner had been specifically charged with unauthorized entry with intent to commit robbery, but stated that "it was the province of the jury to determine the question of intent, and that determination will not be disturbed on review unless the evidence is so improbable as to cast reasonable doubt on the guilt of the defendant." *Cabrera II*, 508 N.E.2d at 716.

The Illinois Supreme Court followed *People v. Zuniga*, 99 Ill.App.3d 396, 425 N.E.2d 1094 (1st Dist. 1981). The facts of *Zuniga* were indeed similar, and equally problematic. The defendant had broken into a church basement, and a priest saw evidence of the break-in and went into the church to investigate. When the priest confronted the defendant, the defendant attempted to rob him. The defendant, like Petitioner, was charged with breaking into the church intending to commit robbery. (The opinion in *Zuniga* does not state whether the jury instructions followed the charge; presumably they did.) The defendant's conviction was affirmed, the court likewise stating that it was for the jury to determine the defendant's intent. The court did not explain how

the jury could have found that the defendant broke into an unoccupied church basement with the intent to commit robbery.

In each case the jury ignored their instructions in favor of their common sense. In common understanding, a burglar is someone who breaks in to steal, and both Petitioner and the defendant in *Zuniga* eminently fit that definition. Since in each case the defendant's conduct also fit the statutory definition of burglary -- though not the definition given the jury -- the court was not terribly troubled by the inconsistency.

Our system of justice, however, does not permit the jury's common sense to substitute for the fixed rules implied by "due process of law." The jury was asked to determine whether Petitioner had an intent to rob, and found that he did. If this finding cannot be sustained, it will not do to say that if the jury had been instructed to find an intent to steal they could have done so. *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)("to hypothesize a guilty verdict that was never in fact rendered--no matter how inescapable the findings to support that verdict might be--would violate the jury-trial guarantee").

In reviewing petitioner's claim, the Illinois Supreme Court stated that the jury's determination of intent would be upheld "unless the evidence is so improbable as to cast reasonable doubt on the guilt of the defendant." *Cabrera II*, 508 N.E.2d at 716. This is not equivalent to the clearly established constitutional standard, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). If specific intent is an element of the crime, as it is of burglary, and there is no evidence from which the requisite intent can be inferred, the conviction fails the *Jackson* test, whether or not there is anything "improbable" about the evidence presented. A reasonable application of the *Jackson* test requires some discussion of how the evidence, viewed in the light

11

most favorable to the prosecution, supports the jury's finding as to the elements of the crime. The conclusion that Petitioner was properly convicted of burglary is either "contrary to" *Jackson* because the Illinois Supreme Court applied a different standard, or, if we assume that its standard was functionally equivalent to *Jackson*'s, it was an unreasonable application of it.

In its answer to the habeas petition, the state takes the position of the Illinois Appellate Court, that because the jury could properly have found Petitioner entered the Foundation with the intent to commit a theft, the *Jackson* test is met. This is not the rationale of the Illinois Supreme Court, however, nor could it be in light of prior cases.

In *People v. Toolate*, 101 Ill.2d 301, 461 N.E.2d 987 (1984), the Illinois Supreme Court reversed a conviction for burglary where the defendant had broken into a house, went to the complaining witness's bedroom and moved some furniture around. When the complainant awoke and saw him, she was able to chase him out of the house without resistance. The defendant was charged and convicted of residential burglary with intent to commit rape. The Illinois Supreme Court reversed the conviction because there was no evidence that the defendant intended to commit rape. The court acknowledged that in the absence of inconsistent circumstances, intent to commit theft can be inferred from proof of unlawful breaking and entering. Nevertheless, proof of breaking and entering was not sufficient to establish the intent to commit another felony; if so, the requirement of specific intent to commit that other felony would be meaningless. *Id.*, 461 N.E.2d at 308. The court concluded:

> The defendant in this case was not charged with burglary with the intent to commit theft, and cannot, therefore, be convicted of that offense. Because the State has failed to prove beyond a reasonable doubt that Toolate entered the dwelling with the intent to commit a rape, the only offense with which he was charged, the conviction and the appellate court's affirmance are reversed.

*Id.* Consistent with *Toolate*, the Illinois Supreme Court in Petitioner's case recognized that his burglary conviction depended on proof of his intent to commit robbery, and could not be

sustained by evidence of intent to commit theft.  *See also People v. Ortiz*, 156 Ill.App.3d 170, 509 N.E.2d 633 (1st Dist. 1987)(Defendant entered home believing it empty, was surprised, and threatened occupant with gun in escaping.  The trial court directed a verdict of acquittal on charge of burglary with intent to commit robbery because although defendant had intent to steal, he did not have the intent to rob when he entered the house.)  In order to sustain Petitioner's conviction, the Illinois Supreme Court unreasonably found that a reasonable jury could have found that Petitioner intended to commit robbery at the time he entered the building.  Petitioner's burglary conviction accordingly cannot stand.

## 3.    Probable Cause For Arrest

Petitioner contends here, as he contended before the Illinois Supreme Court, that probable cause did not exist for his arrest and therefore the trial court erroneously denied his motion to quash his arrest and suppress the evidence acquired as a consequence of that arrest.  Respondent asserts that this court cannot review this claim because the Illinois courts have already done so.  It is not that simple.

*Stone v. Powell*, 428 U.S. 465, 482 (1976), held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone* did not spell out what was meant by "an opportunity for full and fair litigation" of a Fourth Amendment claim and how a federal court on habeas review is to determine whether a petitioner has received it.  Virtually the only elucidation was footnote 36, which appeared with the recapitulation of the language quoted above.  That footnote read, in full: "*Cf. Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)."  *Stone*, 428 U.S. at 494 n.36.

*Townsend* addressed whether a federal district court must hold an evidentiary hearing to determine whether a confession had been coerced in violation of the Fifth Amendment. The Court stated:

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*Townsend*, 372 U.S. at 312-13 (footnote omitted). While declining to "overly particularize" this test, the court continued:

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313.

The Seventh Circuit has understood the Supreme Court's footnote in *Stone* as authorizing courts to look to the *Townsend* factors in determining whether the petitioner had a full and fair opportunity to litigate his Fourth Amendment claim. *See Turentine v. Miller*, 80 F.3d 222, 224 n.1 (7th Cir. 1996). What is critical for our purposes is that the test is not merely procedural. It is not enough, as the state contends, that Petitioner had an opportunity to litigate; the second *Townsend* factor, whether the state court's factual determination is "fairly supported by the record as a whole," indicates that this court must, albeit deferentially, look at the evidence that supports the conclusion.

The Seventh Circuit has stated that a "full and fair" opportunity to litigate requires that "the state court has carefully and thoroughly analyzed the facts and applied the proper constitutional

case law to the facts," *Terry v. Martin*, 120 F.3d 661, 663 (7th Cir. 1997), requiring a review of the decision's evidentiary basis. "[W]e cannot say that a state court has `carefully and fully analyze[d]' the facts of a Fourth Amendment claim if its factual findings are not fairly supported by the record." *Weber v. Murphy*, 15 F.3d 691, 694 (7th Cir. 1994).[5] We therefore ask whether the Illinois courts' finding of probable cause for Petitioner's arrest is supported by the record, mindful of the requirement "that a state court's factual determinations are due a 'high deference.'" *Weber*, 15 F.3d at 694 (citing *Sumner v. Mata*, 455 U.S. 591, 598 (1982)).[6] If not, *Stone v. Powell* does not bar consideration of this claim.

At the time of Petitioner's trial and appeal, as today, it was clearly established that

> [w]hether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it–whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

---

[5] The Eighth Circuit in *Willett v. Lockhart*, 37 F.3d 1265 (8th Cir. 1994), rejected incorporating the *Townsend* factors into the *Stone* analysis, holding that a federal court could not evaluate the evidence supporting the state court's conclusion. In *Turentine v. Miller*, 80 F.3d 222, 225-26 (7th Cir. 1996), the Seventh Circuit in turn rejected the Eight Circuit's "stricter standard":

> The *Weber* standard is not a "subversion of the *Stone* rule," *see Willett*, 37 F.3d at 1271, as the Eighth Circuit suggests. *Weber* does not require substantive review of every Fourth Amendment claim raised in a habeas petition. Rather, in *Weber* and the cases that preceded it, we have sought to explicate what the Supreme Court recognized in *Stone* as a very narrow exception to the general rule that a habeas petitioner may not bring Fourth Amendment claims. We have consistently held that a claim is *Stone*-barred if the petitioner simply argues that the state court made a mistake in applying Fourth Amendment law. . . . Instead, habeas review of Fourth Amendment claims is reserved for instances where the state court made an egregious error (e.g., failed to apply Supreme Court precedent directly on point after the argument was clearly presented), thus effectively depriving the petitioner of the ability to vindicate his federal rights in state court. This is consistent with the understanding of "opportunity for full and fair litigation" adopted by several courts. . . . The *Weber* standard is not more than a restatement of the narrow exception set out in *Stone*, and we therefore decline Indiana's request to revisit our definition of "opportunity for full and fair litigation."

[6] *Weber* was decided prior to the enactment of the Antiterrorism and Effective Death penalty Act of 1996. Congress has since made explicit Weber's "high deference"standard by stating that factual findings "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

*Beck* v. *Ohio*, 379 U.S. 89, 91 (1964); *see also Hunter* v. *Bryant*, 502 U.S. 224, 228 (1991)

(same). It was also established that probable cause is not transferred by association -- that simply

being in the company of a person suspected of crime is not probable cause to search or arrest.

*See Ybarra* v. *Illinois*, 444 U.S. 85, 91 (1979) ("a person's mere propinquity to others

independently suspected of criminal activity does not, without more, give rise to probable cause

to search that person"); *Sibron* v. *New York*, 392 U.S. 40, 62-63 (1968) (no probable cause to

believe individual seen talking to a number of narcotics addicts was engaged in drug trafficking).

Lopez's negotiation of checks stolen from the victim clearly established probable cause as to him,

but merely being seen in Lopez's company would not establish probable cause as to Petitioner.

The Illinois Supreme Court in *Cabrera II* implicitly conceded this rule of law, but believed

that the record showed something more: that the arresting officers were aware of Petitioner's

recent burglary convictions.[2/] If the police had known Petitioner was a proven burglar, his

following Lopez as Lopez negotiated the stolen checks could raise an inference that he had

something to do with the theft. But in a strong dissent Justice Seymour Simon pointed out that

*nothing* in the record showed that the police were aware of Petitioner's criminal history at the

time they went to his home to arrest him. Because the dispute is critical, we will recapitulate it in

detail.

In determining that probable cause existed for Petitioner's arrest, the Illinois Supreme

Court noted the following:

> The defendant seriously misstates the issue when he says it is simply whether the
> defendant's being with a person who purchased merchandise with a stolen traveler's
> check gave probable cause to arrest. It seems clear that the police had other
> significant information from which probable cause to arrest was reasonably inferred.

---

[2/] According to publicly available records kept by the Illinois Department of Corrections, Petitioner was on probation following convictions for burglary and attempted burglary at the time of the offenses in question.

16

Derrick Moore, from the "Different Circle" store, looked through approximately 200 police photographs before identifying a photograph of the defendant as one of the men who was present at the time the purchase was made with the stolen traveler's check. Too, Moore told the detectives that the defendant had a large scar on his neck; a scar that was not visible in the photograph. At trial prior to identifying the defendant's picture, Moore testified that, after speaking with the investigating officers, he had gone to a police station and "looked through pictures, mug shots." The defendant's attorney moved for a mistrial on the ground that the reference to "mug shots" was prejudicial. The motion was denied. Later when the prosecution was moving for the admission of various exhibits, including the police photograph of the defendant that Moore had picked out, Mr. Lyster, the defendant's attorney, objected to the photograph's admission. The record reads:

"MR. RAAB [Prosecutor]: People's Exhibit Number 43 for identification, having been identified as a colored photograph of the defendant, William Cabrera, being identified by Derrick Moore at Area 6 Violent Crimes vicinity on the 23rd of February, 1981; and also having been identified by Detective Thomas Sappanos as the photograph that was in fact identified by Derrick Moore on that day and at that place.

MR. LYSTER: Your Honor, I will object to that. *That is the mug shot. Of course, it has his breastplate in front of him, indicating his RIWR number on January 21, 1980.*

I think, obviously, it would be prejudicial for it to be admitted, even if it is altered or modified, or clipped, because you would further focus attention on the bottom photo by even covering it. In other words, if we covered the bottom of it with any kind of piece of paper. Obviously, you don't have to be--you know, all you have to do is be a Sam Spade to know what this photo is." (Emphasis added.)

The trial court, after telling the prosecutor, who was arguing for admission of the photograph, that the jury would be shown whatever exhibits were admitted in evidence, denied its admission. Thus, the officers had a Chicago police department mug shot of the defendant with an identification board, and as his attorney complained, the mug shot indicated his Chicago police department identification number and referred to January 21, 1980.

Detective Thomas Sappanos and Thomas Keane were the principal officers in the murder investigation, but at least two other officers were assigned to the investigation, Sappanos testified. Sappanos testified, too, that he prepared about four investigative reports prior to the defendant's arrest on February 24 and that he made a specific report on the identification of the defendant before he and Keane arrested him at 5523 North Kenmore Avenue in Chicago. It is apparent that the police, from the defendant's mug shot with his name and the police identification number, were able to examine the Chicago police department reports regarding the defendant and could ascertain his record and address. Thus, they were able to arrest him at his apartment at 5523 North Kenmore Avenue in Chicago. As stated, Detective Sappanos testified that he prepared a report on the identification of the defendant

before his arrest. He certainly would have examined the Chicago police department records of the defendant.

At the time of the defendant's arrest, it must be reasonably concluded that the detectives had knowledge of the defendant's entering and leaving the store with Lopez, the man who cashed the murder victim's check; that his Chicago police department mug shot, with his police identification number, had been identified by Moore; and that from the mug shot they ascertained the information appearing in the Chicago police department records regarding the defendant.

That information included a record of the defendant's convictions for burglary and attempted burglary. At the hearing on the defendant's motion to quash arrest and suppress evidence the State introduced copies of these convictions for burglary and attempted burglary.

Other information in the police department records which was available through the defendant's so-called "rap sheet" or criminal record appears in the record before us in the presentence investigation report. It discloses other burglary arrests, including one on January 21, 1980, which date the defendant's attorney said appeared on the defendant's mug shot together with his police department identification number.

*Cabrera II*, 508 N.E.2d at 712-713 (emphasis in original).

The problem, as Justice Simon pointed out, is that no one testified that the police ever looked up Petitioner's police record. Because Sappanos prepared investigative reports, the majority opinion stated, he "certainly would have examined the Chicago police department records." But Sappanos did not testify that he did, nor even that it was standard procedure to do so.

Justice Simon pointed out that there is actually some evidence in the record suggesting that the police did *not* consult Chicago Police Department records before setting out to arrest Petitioner, because an examination of them shows that the last entry the police officers would have seen prior to Petitioner's arrest showed him living at 1230 W. Argyle, not 553 North Kenmore where he was arrested. *Cabrera II*, 508 N.E.2d at 713. Of course, this does not preclude the possibility that the officers reviewed Petitioner's criminal history and obtained his

current address from another source. But the fact remains that nothing in the record indicates that the arresting officers knew of Petitioner's criminal history when he was arrested.

Justice Simon's dissent also noted that the State had admitted during oral argument that it was not in the record what police officers actually knew at the time they arrested Petitioner. *Id.* at 718. This is consistent with the State's brief in the Illinois Supreme Court, which relied solely on the evidence that Petitioner was shopping together with the individual who cashed the stolen traveler's checks. State's Ill. Sup. Ct. Br. at 25-26.[8/]

We respectfully disagree with the Illinois Supreme Court majority and find that the existence of probable cause is not supported by the record. The "record" cannot be understood to include plausible assumptions. It might be plausible to assume that a burglar with an extensive record would be known to every member of a small-town police department, but for a court to make that kind of assumption in the absence of testimony would derogate the Fourth Amendment.

Because we find that the finding of probable cause is not supported by the record, *Stone* v. *Powell* does not bar consideration of Petitioner's third claim, and this conclusion also requires that the petition be granted. Although the Illinois Supreme Court correctly identified the governing legal rule as set forth in *Beck*, it applied it unreasonably to the facts. *See Williams v. Taylor*, 529 U.S. 362, 407-408 (2000). The record shows only that the arresting officers knew that Petitioner had been identified by a store clerk as having accompanied someone who had purchased items with the victim's traveler's checks. This evidence is even less than in *Beck*, where the Supreme Court stated:

---

[8/] Although the argument summary in the table of contents refers to Petitioner as "a known burglar," the text of the brief discussing the issue of probable cause does not refer to Petitioner's criminal history or how the arresting officers were supposed to have been aware of it. The State's primary argument was that Petitioner had waived the issue of lack of probable cause. State's Ill. Sup. Ct. Br. at 24. Since the Illinois Supreme Court reached the merits, that argument is irrelevant in this court.

The record is meager, consisting only of the testimony of one of the arresting officers, given at the hearing on the motion to suppress. As to the officer's own knowledge of the petitioner before the arrest, the record shows no more than that the officer "had a police picture of him and knew what he looked like," and that the officer knew that the petitioner had "a record in connection with clearing house and scheme of chance." Beyond that, the officer testified only that he had "information" that he had "heard reports," that "someone specifically did relate that information," and that he "knew who that person was." There is nowhere in the record any indication of what "information" or "reports" the officer had received, or, beyond what has been set out above, from what source the "information" and "reports" had come. . . .

*Beck*, 379 U.S. at 94. The Court concluded that "[n]o decision of this Court has upheld the constitutional validity of a warrantless arrest with support so scant as this record presents." *Id.* 379 U.S. at 95. As it was established that simply being in the company of one who is a suspect does not constitute probable cause, *Ybarra*, 444 U.S. at 91, the Illinois' Supreme Court's application of established constitutional law was unreasonable.

## 4.    Post-Conviction Relief

Petitioner's fourth claim takes issue with the dismissal of his petition for post-conviction relief. First, Petitioner argues that the Illinois legislature failed to provide him with adequate and meaningful notice of changes to the post-conviction relief statute that shortened the time in which a state prisoner must file his petition, and that the absence of such notice violated his Fourteenth Amendment right to due process.[9] Second, Petitioner claims that his failure to file a timely post-

---

[9]    At the time of Petitioner's conviction the limitations provision of the Post-Conviction Act, Ill. Rev. St. ch. 38 ¶122-1(c), read as follows:

No proceedings under this Article shall be commenced more than 6 months after the denial of a petition for leave to appeal or the date for filing such a petition if none is filed or issuance of the opinion from the Illinois Supreme Court or 6 months after the date of the order denying certiorari by the United States Supreme Court or the date for filing such petition if none is filed or 20 years from the date of conviction, whichever is later, unless the petitioner alleges facts showing that the delay was not due to his culpable negligence.

Effective January 1, 1984, the 20-year period from date of conviction was shortened to 10 years. P.A. 86-1210, approved Aug. 30, 1990, reduced the limitations period to 3 years, effective January 2, 1992.

conviction petition was the result of being denied access to a law library "near the time of the filing deadline," Pet. at 47, and because the Department of Corrections twice confiscated the papers of a "law clerk" assisting him with the petition, denying him his First Amendment right of access to the courts. Petitioner concludes by stating: "Based upon petitioner's inability to obtain state review of his post conviction petition as a result of 'direct arbitrary state' activity, this Court must hear the issues raised in petitioner's post-conviction petition." (Pet. at 48.)

These are not in themselves claims for habeas relief, since they have nothing to do with the lawfulness of Petitioner's conviction or sentence, but are offered as reasons for this court to consider the claims contained in Petitioner's untimely post-conviction petition.[10] Accepting these allegations as true, they do not permit the court to review the defaulted claims.

If state courts refuse to review a petitioner's claims as a consequence of the petitioner's failure to comply with a state procedural rule that is independent of the federal question and adequate to support the judgment, those claims are procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Failure to comply with the limitations period of the Illinois Post Conviction Act is such an independent and adequate state ground. *Barksdale v. Lane*, 957 F.2d 379, 382 (7th Cir. 1992), *cert. denied sub nom. Barksdale v. Peters*, 506 U.S. 890 (1992). A federal court may not review a defaulted claim unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. A "fundamental miscarriage of justice" is not the violation of a constitutional rule, but the probability that an innocent person has been

---

[10] Petitioner asserted the following claims in his post-conviction petition: (1) ineffective assistance of trial counsel; (2) the trial court improperly considered a factor in aggravation when imposing an extended sentence; (3) ineffective assistance of appellate counsel; (4) petitioner was convicted based on evidence seized in an unlawful arrest; and (5) the trial court did not sentence petitioner with the objective of restoring him to useful citizenship.

convicted. As it requires persuasive new evidence of actual innocence, it is inapplicable here. *Schlup v. Delo,* 513 U.S. 298, 316 (1995). Petitioner has not show acceptable cause for his default.

The statute that barred Petitioner's petition by reducing the limitations period to three years, P.A. 86-1210, was approved August 30, 1990, but only became effective January 1, 1992. Petitioner cannot argue that the statute was unconstitutionally retroactive. After August 30, 1990, Petitioner could not rely on being able to file ten years after his conviction. Petitioner complains that he did not receive "adequate and meaningful" notice of this legislative act, but the Constitution does not require advance notice to prisoners (or anyone else) of changes in the law. *See Torres v. U.S. Immigration and Naturalization Service,* 144 F.3d 472 (7th Cir. 1998).

The Seventh Circuit's opinion in *Barksdale,* 957 F.2d at 382-83, addressed the 1984 reduction of the limitations period from twenty years to ten, holding that it did not constitute "cause" excusing the petitioner's failure to file a timely post-conviction petition. That holding is dispositive here.

Petitioner cannot avoid default by stepping back and alleging that he had good cause for failing to file on time. As *Barksdale* pointed out, the Illinois Post-Conviction Act permits a petitioner to avoid the limitations bar if the petitioner "alleges facts showing that the delay was not due to his culpable negligence." In finding Petitioner's post-conviction petition untimely, the Illinois courts necessarily found that Petitioner had not made allegations that, if true, would establish his lack of culpable negligence. This finding is itself an independent determination under state law and binding on this court. *Barksdale,* 957 F.3d 383-84; *see also Starks v. Welborn,* No. 99 C 1117, 1999 WL 674754 (N.D. Ill. 1999)(Castillo, J.) at *4.

Further, "cause" "must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman,* 501 U.S. at 753. Because there is no right to counsel in post-

22

conviction proceedings, the failings of a post-conviction attorney are attributed to the petitioner; an attorney's mistakes or blunders in failing to file on time do not constitute "cause." *Coleman*, 501 U.S. at 752-53. Neither do the mistakes of a prison law clerk. *United States ex rel. Williams v. Cowan*, No. 98 C 3204, 2001 WL 800085 (N.D. Ill. 2001)(Grady, J.).

Petitioner alleges that acts of the State, in keeping him from the law library for a time and confiscating papers used by the inmate law clerk, constitute an independent constitutional violation and so should not be subject to the same rule. But Petitioner does not allege that either action was intended to prevent his access to the court, and accidental deprivations that result in interference with an inmate's access to the courts are not constitutional violations. *See Kincaid v. Vail*, 969 F.2d 594, 602 (7th Cir. 1992), cert. denied sub nom. *Sceifers v. Vail*, 506 U.S. 1062 (1993). In the absence of a showing of intentional interference with a petitioner's access to the courts, or a showing that it was impossible (not merely more difficult) for the petitioner to have prepared the petition without state assistance (as in the case of a petitioner who speaks no English or is mentally incompetent, for example), the risk that some vicissitude will thwart the timely filing of a post-conviction petition is fairly attributed to the petitioner, not the state. Petitioner has not alleged that he was denied access to the law library for a significant amount of time. *Cf. Tellez v. Gilmore*, No. 97 C 3228, 1998 WL 89336 (N.D. Ill. Feb. 18, 1998) (petitioner who was in solitary confinement and was provided with limited access to a law library did not sufficiently show that he could not have filed a petition for post-conviction relief). Direct review of Petitioner's conviction ended on November 2, 1987, when the U.S. Supreme Court denied certiorari. Even with the reduced limitations period, Petitioner had slightly more than four years to prepare and file his post-conviction petition, and cannot claim the State prevented him from filing.

## 5. Ineffective Assistance of Appellate Counsel

Petitioner raises as a claim for habeas relief the ineffective assistance of his appellate counsel. Like the foregoing claims, this is not itself grounds for habeas relief, but would permit this court to consider constitutional errors that could have been, but were not, raised in Petitioner's direct appeal. Petitioner raises at least one such claim. In his concurring opinion in *Cabrera II*, 508 N.E.2d at 717, Chief Justice Clark noted that Petitioner's conviction was tainted by a separate Fourth Amendment violation: apart from the alleged lack of probable cause, petitioner's arrest in his home without a warrant was unlawful under *Payton v. New York*, 445 U.S. 573 (1980). Chief Justice Clark concurred in the court's opinion, however, because the *Payton* issue had been waived by failing to raise it on appeal.

In his post-conviction petition, Petitioner claimed that failing to raise the issue amounted to ineffective assistance of appellate counsel. Had the issue of ineffective assistance of appellate counsel been preserved, Petitioner could have raised it in this court, and a finding that his appellate counsel had been ineffective would have permitted this court to reach the underlying *Payton* claim. However, our finding that the claims Petitioner sought to raise in his post-conviction petition are defaulted dooms this claim as well.

## 6. The Illinois Accountability Statute

Petitioner argues that the Illinois statutory provision by which a person may be held accountable for the acts of another is unconstitutional. That provision, formerly Ill. Rev. Stat. 1981, ch. 38, par. 5-2(c), now codified at 720 ILCS 5/5-2(c), states that "[a] person is legally accountable for the conduct of another when .... (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

Illinois decisions have interpreted this to mean that a person who joins with another in a "common design" to commit an unlawful act is accountable for any crimes that occur in furtherance of that design, whether specifically intended by the co-participant or not. *See People v. Cooper*, 194 Ill.2d 419, 743 N.E.2d 32 (2000); *People v. Taylor,* 164 Ill.2d 131, 646 N.E.2d 567 (1995); *see also Brumley v. DeTella*, 83 F.3d 856, 863 (7th Cir. 1996).

Petitioner cites no authority for the proposition that the Illinois accountability statute is unconstitutional. While the Constitution requires the state to prove a defendant guilty beyond a reasonable doubt of all elements of a criminal offense, defining the offense is a matter of state law for state legislatures and state courts. *Burris v. Farley*, 51 F.3d 655, 659-60 (7th Cir. 1995). The state produced evidence from which the jury could find that Lopez committed murder and that Petitioner had the requisite relationship to him to be held responsible for it. In any event, this claim was never presented to the Illinois courts and is accordingly defaulted.

## CONCLUSION

All of Petitioner's claims are defaulted, meritless, or both, except his claim that the police lacked probable cause for his arrest and his claim that the jury could not properly have found him guilty beyond a reasonable doubt of burglary. These are "errors that undermine confidence in the fundamental fairness of the state adjudication," and that justify the issuance of the federal writ. *Williams v. Taylor*, 529 U.S. 362, 375 (2000). The court grants Petitioner's application for writ of habeas corpus with respect to Petitioner's 1983 convictions for murder, robbery and burglary, conditioned on the invalidation of the other, presumptively lawful, sentences authorizing his continued confinement. Petitioner's 1983 convictions for murder, robbery and

burglary are declared to be void and of no effect unless the State of Illinois retries petitioner within 120 days of this order.

**IT IS SO ORDERED**

Date: October 30, 2001

Enter: _JOAN H. LEFKOW_
JOAN HUMPHREY LEFKOW
United States District Judge